**Alexander STAHOVICH, Jr., Plaintiff**

v.

**Michael J. ASTRUE, Commissioner of Social Security Administration,[1] Defendant.**

**Civil Action No. 06–30092–KPN.**

United States District Court,
D. Massachusetts.

Oct. 29, 2007.

Charles R. Casartello, Jr., Earlon L. Seeley, III, Pellegrini Seeley Ryan &

---

1. Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is substituted as the defendant in this action pursuant to Fed.R.Civ.P. 25(d)(1) and (2).

Blakesley, P.C., Springfield, MA, for Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION TO REVERSE OR REMAND AND THE COMMISSIONER'S MOTION TO AFFIRM (Document Nos. 15 and 17)*

NEIMAN, United States Chief Magistrate Judge.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3). Alexander Stahovich, Jr. ("Plaintiff") asserts that the Commissioner's decision denying him such benefits—memorialized in a May 27, 2004 decision of an administrative law judge—is in error. He has filed a motion to reverse or remand and the Commissioner, in turn, has moved to affirm.

With the parties' consent, this matter has been assigned to the undersigned for all purposes, including entry of judgment. *See* 28 U.S.C. § 636(c); Fed.R.Civ.P. 73(b). For the reasons that follow, the Commissioner's motion to affirm will be denied and Plaintiff's motion will be allowed to the extent it seeks remand.

### I. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. *Rodriguez*, 647 F.2d at 222; *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir.1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter ... a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

### II. BACKGROUND

Plaintiff, born on September 13, 1948, has a high school education and an Associates Degree in environmental technology. (Administrative Record ("A.R.") at 110, 120.) His work experience includes jobs as a dishwasher, utility worker, residential counselor, waste water operator, gas station attendant, retail clerk and landscaper. (A.R. at 34–35; 115, 150, 597–603.)

### A. Medical History

Plaintiff claims that his disability began on February 1, 2000, due to two ruptured

discs and depression. (A.R. at 110, 114, 117, 389.) There appears to be little dispute with regard to the medical record.

Following an injury while working at Bay Path College, Plaintiff went to Baystate Medical Center's urgent care center on March 3, 2000, complaining of back pain. (A.R. at 37, 195–96.) The examination showed full range of motion in Plaintiff's neck, no spinal tenderness or spasms, and nearly full muscle strength. (A.R. at 195–96.) Plaintiff's straight leg raising was twenty-five degrees on the left and between thirty and thirty-five degrees on the right. (A.R. at 196.) The treating physician renewed Plaintiff's prescription for Celebrex. (*Id.*)

On March 6, 2000, Dr. Bentley Ogoke from Pioneer Valley Pain Management examined Plaintiff for complaints of low back pain. (A.R. at 559–62.) Dr. Ogoke noted that Plaintiff had previously undergone lumbar spinal fusion secondary to a herniated disk. (A.R. at 560.) Plaintiff had a slightly antalgic gait, limited lumbar flexion and extension, and tenderness in various regions of his left back. (A.R. at 561.) Dr. Ogoke prescribed muscle relaxants and recommended a physical therapy evaluation, bioelectric treatments, and a CT scan. (A.R. at 561–62.) Shortly thereafter, Plaintiff began a series of epidural steroid injections and an exercise plan. (A.R. at 557–58.)

A March 9, 2000 CT scan revealed disc degenerative changes at L4–5 and L5–S1 with possible herniation at L4–5 and a bulge at L5–S1. (A.R. at 554–55.) Dr. Ogoke advised Plaintiff to continue home exercise and physical therapy. (*Id.*) Epidural steroid and sacroiliac joint injections were administered on April 10, April 27, and May 12, 2000. (A.R. at 543–44, 547, 550–51.) Over the next several months, Plaintiff saw Dr. Ogoke for re-evaluation of his low back pain and prescription refills. (A.R. at 530–42.)

On August 29, 2000, Plaintiff was referred to Dr. Marc Linson for a surgical opinion. (A.R. at 189.) Dr. Linson found back motion at 75 percent due to Plaintiff's low back and left thigh discomfort. (*Id.*) Other tests (such as heel-toe walking, leg neurological testing and foot circulation) were normal, although X-rays showed mild scoliosis and slight narrowing at L4–5 and L5–S1. (*Id.*) Dr. Linson observed that Plaintiff was mostly interested in pain medicine and indicated that his prescriptions, if any, should come from Dr. Ogoke or a pain clinic. (A.R. at 188–89.) Dr. Linson recommended over-the-counter medications in the interim and scheduled a lumbar spine magnetic resonance imaging ("MRI"). (A.R. at 188–190.) The MRI revealed post-operative changes at L4–5 on the left, a small residual recurrent disc herniation causing impression on Plaintiff's left L5 nerve root, and a mild left disc herniation and spur formation at L5–S1 with encroachment of Plaintiff's left L5 nerve root and mild impression of Plaintiff's left S1 nerve root. (A.R. at 188).

Plaintiff continued to see Dr. Ogoke monthly between September 29, 2000 and February 22, 2002; during this period, Plaintiff underwent lumbar facet joint injections (December 21, 2000, and January 11, 2001), radiofrequency lesioning (March 21, 2001), and lysis of adhesions (November 9 and December 18, 2001). (A.R. at 475–529.) On February 22, 2002, Dr. Ogoke noted that Plaintiff was unable to stand fully upright, walked flexed forward at the waist five to ten degrees, and was tender over his lower spine. (A.R. at 475–76.) He also noted a slightly antalgic gait and lumbar flexion of ninety degrees and prescribed OxyContin, Zanaflex and Celebrex as well as a series of epidural steroid injections. (*Id.*)

On April 22, 2003, Plaintiff was referred to Dr. Claude Borowsky of Mercy Medical Center for an evaluation. (A.R. at 568.) Dr. Borowsky noted that Plaintiff had a history of narcotics abuse and had been discharged from Baystate's pain program for violation of its pain contract. (A.R. at 569.) Upon examination, Dr. Borowsky recommended an MRI as well as participation in Narcotics Anonymous ("NA"). (A.R. at 569–70.) Plaintiff was also advised that he could benefit from a spinal cord stimulator as well as a chronic narcotic regimen that would require strict adherence to a contract with no use of prescribed narcotics. (*Id.*)

Plaintiff again saw Dr. Borowsky in August of 2003. (A.R. at 587–88.) At a follow-up visit in October of 2003, Plaintiff stated that he recently had a problem with poly substance abuse but was clean and attending NA and church. (A.R. at 582.) Plaintiff's neurologic examination was normal in the lower extremities and his mental status was clear without signs of depression. (*Id.*) Dr. Borowsky advised that the medication regime, *i.e.,* Effexor for his depression, would not change unless he was treated for substance abuse. (A.R. at 582–83, 587–88.)

In November of 2003, Dr. Raymond Auletta observed that Plaintiff still had pain in his lower back with some radiation to his right thigh but that his lumbar range of motion was full without evidence of neurological deficits. (A.R. at 179.) Dr. Auletta noted that Plaintiff's pain was controlled by Duragesic, that no further oral medications were to be prescribed, and that Plaintiff was to continue attending NA meetings. (A.R. at 579–80.)

Physical residual functional capacity assessments were completed by William Straub, M.D., on December 11, 2000, and Larry Meade, O.D., on March 5, 2001, both of whom are doctors with the Disability Determination Service ("DDS"). (A.R. at 210–15, 320–27.) Both doctors determined, based on their review of the medical records, that Plaintiff could frequently lift ten pounds, occasionally lift twenty pounds and sit and stand/walk for six hours each in an eight-hour day. (A.R. at 211, 321.) Both also concluded that Plaintiff should avoid concentrated exposure to hazards. (A.R. at 214, 324.) Although Dr. Straub limited Plaintiff to occasionally engaging in all postural activities, Dr. Meade limited Plaintiff to only occasional climbing, stooping and crouching. (A.R. at 212, 322.)

As for mental health treatment, Plaintiff was seen by Jocelyn Johnson, a therapist at the River Valley Counseling Center, between February 23, 2000, and January 29, 2002. (A.R. at 237–69, 328–32, 352–79.) Over the course of her treatment, Ms. Johnson found Plaintiff alert and oriented and not at risk of harm to himself or others. (See, *e.g.,* A.R. at 268, 330, 357.) She also noted that he had fair to good insight and judgment and goal-directed speech without any clear evidence of a thought disorder or paranoia. (See *id.*) Ms. Johnson noted as well that Plaintiff was on morphine, had attended a one-week "de-tox" treatment at Providence Hospital, and continued to manipulate people and the system in struggling with his medication issues. (See generally A.R. at 237–69, 328–32, 352–79.) Plaintiff remained somewhat stable during this time on Effexor, Klonopin, Trazodone and Neurontin. (See *id.*)

On December 21, 2000, Joseph Litchman, a non-examining DDS psychologist, completed a mental residual functional capacity assessment and a psychiatric review form. (A.R. at 216–33.) Dr. Litchman determined that Plaintiff had mild restrictions in his activities of daily living and social functioning and moderate limitations

in his ability to concentrate. (A.R. at 216, 230.) Dr. Litchman found no significant difficulties with social interaction and found that Plaintiff was able to understand and remember simple instructions and carry out simple routines on a consistent basis. (A.R. at 216–17.) A second state agency psychologist, Alex Ursprung, generally concurred with Dr. Litchman's assessments. (See A.R. at 333–50.)

On December 19, 2000, Plaintiff's primary care physician, a Dr. Carlan, completed a questionnaire regarding Plaintiff's disc disease and nervous condition. (A.R. at 233–36.) He stated that Plaintiff could not deal with routine stress, experienced memory and attention problems and had deterioration in habits, interests and activities of daily living. (*Id.*)

B. *Procedural History*

Plaintiff applied for both SSDI and SSI benefits on November 6, 2000. (A.R. at 110–112, 114, 389–92.) His applications were denied initially and on reconsideration. (A.R. at 71–75, 78–81, 395–98, 400–03.)

Plaintiff then requested a hearing before an administrative law judge ("ALJ"). The hearing was held on April 3, 2002; both Plaintiff and a vocational expert testified. In a decision dated June 5, 2002, the ALJ found that Plaintiff was not disabled. (A.R. at 13–24.) The Appeals Council denied Plaintiff's subsequent request for review, after which Plaintiff sought judicial review.

On May 6, 2003, this court, endorsing the Commissioner's assented-to motion, remanded the case for the ALJ to further evaluate the opinions of Plaintiff's physicians, reassess Plaintiff's residual functional capacity (particularly his mental residual functional capacity), and obtain supplemental evidence from a vocational expert. *See Stahovich v. Commissioner*

*of Social Security,* Civil Action No. 02–30174–KPN. (See also A.R. at 5–6, 436–41.) After holding a second hearing on April 7, 2004, the ALJ, in a decision dated May 27, 2004, again determined that Plaintiff was not disabled. (A.R. at 413–32.) The Appeals Council denied review, thereby rendering the ALJ's second decision final for present purposes. (A.R. at 404–06.)

### III. Discussion

An individual is entitled to SSDI benefits if, among other things, he has an insured status and, prior to the expiration of that status, was under a disability. *See* 42 U.S.C. § 423(a)(1)(A) and (D). Entitlement to SSI, on the other hand, requires a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff's need, for purposes of SSI, it is not challenged. However, as discussed below, there is some confusion as to Plaintiff's insured status for purposes of SSDI eligibility.

### A. *Insured Status*

As described, on May 6, 2003, this court allowed the Commissioner's assented-to motion to remand Plaintiff's original appeal for a new hearing before the ALJ. The memorandum in support of the motion indicated, in applicable part, that the ALJ was to evaluate Plaintiff's eligibility for "Title XVI," *i.e.,* SSI, benefits. (A.R. at 440.) However, with respect to Plaintiff's claim for "Title II," *i.e.,* SSDI, benefits, the memorandum explained that "Plaintiff is insured for Medicare only purposes through June 30, 2002" and that, on remand, the ALJ was to "consider Plaintiff's eligibility for Medicare benefits, only, based on Plaintiff's Medicare-qualified Government Employee earnings for the years 1990 through 1992." (A.R. at 440–41.) The Appeals Council thereafter remanded the case to the ALJ with di-

rections that he "comply with the court order and ... take the actions as set forth in the memorandum in support of· the motion for remand." (A.R. at 447.)

In his subsequent decision dated May 27,· 2004, the ALJ acknowledged that "[t]he Appeals Council indicated that there was no proof of insured status with respect to the application for [SSDI]" and formally found that Plaintiff was "not insured" for SSDI. (A.R. at 416 n. 1, 431.) In the body of his opinion, however, the ALJ appears to have analyzed Plaintiff's earnings record and to have determined—without reference to the "Medicare only" limitation—that Plaintiff was "last insured" for SSDI on June 30, 2002. (A.R. at 417.) Needless to say, this appears to contradict the basis of the parties' agreed-upon remand.

This confusion is compounded to a degree by Plaintiff's argument in support of his present motion to reverse the ALJ's decision. To be sure, Plaintiff recognizes in his supporting memorandum of law that the Appeals Council had indicated that there was *no* proof of Plaintiff's insured status for purposes of SSDI eligibility and that the ALJ found that he was *not* entitled to a period of SSDI disability. (Document No. 16 at [2] and n. 1.[2]) Nonetheless, Plaintiff argues that he was "last insured as of June 30, 2002, echoing perhaps the confusing statement in the body of the ALJ's decision. (*Id.* at [11].)

Plaintiff pursues this argument in the most conclusory of ways, provides no factual support for his claim that he was last insured as of June 30, 2002, and offers no reason why the court should not accept either the Commissioner's representation in the agreed-upon motion to remand that he was insured for purposes of Medicare benefits only or the ALJ's formal finding

that he was not insured for SSDI. Thus, were the court otherwise prepared to allow the Commissioner's motion to affirm, it would deem Plaintiff's argument with respect to his insured status waived.

The court, however, for reasons unrelated to Plaintiff's insured status, is prepared to deny the Commissioner's motion and allow Plaintiff's motion for remand. Accordingly, the court will not further address Plaintiff's argument regarding his insured status except to say this: the hearing on remand will provide the ALJ the opportunity to resolve the insured status question once and for all.

## B. *Disability Standard and the ALJ's Decision*

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can· be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). *See also* § 1382c(a)(3)(A) (similar). An individual is considered disabled under the Act

only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

**2.** Page numbers to Plaintiff's memorandum of law are in brackets as Plaintiff provides none.

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these questions: Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability (question one); Plaintiff has impairments that are "severe," but which do not meet or medically equal one of the listed impairments in Appendix 1 (questions two and three); and Plaintiff is able to perform his past relevant work as a gas station attendant (question four). (A.R. at 431.) Accordingly, the ALJ concluded that Plaintiff does not suffer from a disability and had no reason to reach question five. (See *id.*)

## C. Plaintiff's Challenge to the ALJ's Decision

Plaintiff makes three arguments in support of his motion. First, Plaintiff contends that the ALJ did not fully inquire about or consider his subjective complaints of pain, in violation of the Program Operations Manual System DI T00401.570 ("POMS") and the First Circuit's decision in *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19 (1st Cir.1986). Second, Plaintiff argues that the ALJ improperly credited the opinions of non-treating DDS physicians over those of his treating doctors. Third, Plaintiff argues that the ALJ failed to fully take into account restrictions on his residual functional capacity; in particular, Plaintiff contests the ALJ's conclusion that he could do past relevant work.

Given the strength of Plaintiff's third argument, upon which the parties themselves focus, the court finds it unnecessary to address Plaintiff's first two. Thus, even if the court were to conclude that the Commissioner would prevail on Plaintiff's first two arguments, the court believes that errors relating to the third are so manifest as to independently require remand. The court's analysis follows.

As described, the ALJ determined at step four of the five-step analysis that Plaintiff could engage in what the ALJ deemed to be previous work as a gas station attendant. Such work, the ALJ found, was the only "light work," among the many jobs in which Plaintiff previously engaged, that he could still do. As indicated, Plaintiff disputes the propriety of that finding because, in violation of an SSDI regulation, 20 C.F.R. § 404.1565(a), and presumably its SSI analogue, such work

may have predated the administrative hearing by more than fifteen years.[3] For his part, the Commissioner argues that the fifteen year limit mentioned in the regulation presents no bar to the ALJ's contradiction of Plaintiff's experience as a gas station attendant.

Three preliminary matters need to be noted before the court addresses the parties' underlying dispute. First, despite the fact that the regulations, given their context in the regulatory scheme, address the vocational components of a claimant's residual functional capacity—a determination usually made at step five of the analysis—they have been applied at step four as well. *See Lopez–Diaz v. Sec'y of Health & Human Servs.*, 673 F.2d 13, 15 (1st Cir. 1982) ("It is reasonable to reach back further in time to determine whether an applicant can perform the same job he once performed than when one seeks to determine whether a previously obtained skill will help him to perform a different job.") *See also Wallschlaeger v. Schweiker*, 705 F.2d 191, 196–97 (7th Cir.1983) (similar).

Second, the court will accept for present purposes the vocational expert's opinion that the job of a gas station attendant involves "light, unskilled work," despite the fact that the Commissioner now acknowledges that the job is classified by the Dictionary of Occupational Titles ("DOT") as "medium." To be sure, the Commissioner maintains that the vocational expert's classification of the job as "light" is more consistent with Plaintiff's testimony. But this issue was never addressed by the ALJ and, as will become evident, need not be resolved at this time.

Third, if applied to Plaintiff at the time of the second hearing, the fifteen-year period mentioned in the regulation would go back as far as 1989. There was no substantial evidence before the ALJ, however, that Plaintiff had performed the job of gas station attendant within that time period, the Commissioner's present suggestion to the contrary notwithstanding. In any event, this issue, too, can be sorted out on remand.

As to the heart of the parties' dispute, the fifteen-year time period has not been interpreted as an absolute rule and, in appropriate cases, past work which falls outside that time frame has been deemed

---

**3.** The SSDI regulation cited by the parties provides as follows:

> (a) General. Work experience means skills and abilities you have acquired through work you have done which show the type of work you may be expected to do. Work you have already been able to do shows the kind of work that you may be expected to do. We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity. We do not usually consider that work you did 15 years or more before the time we are deciding whether you are disabled (or when the disability insured status requirement was last met, if earlier) applies. A gradual change occurs in most jobs so that after 15 years it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply. The 15–year guide

> is intended to insure that remote work experience is not currently applied. If you have no work experience or worked only "off-and-on" or for brief periods of time during the 15–year period, we generally consider that these do not apply. If you have acquired skills through your past work, we consider you to have these work skills unless you cannot use them in other skilled or semi-skilled work that you can now do. If you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled. However, even if you have no work experience, we may consider that you are able to do unskilled work because it requires little or no judgment and can be learned in a short period of time.

> 20 C.F.R. § 404.1565(a) (2007). The parallel regulation for SSI, which neither party cites, is 20 C.F.R. § 416.965(a) (2007).

relevant. For example, the job at issue in *Lopez–Diaz* concerned unskilled work performed seventeen years earlier. *Id.*, 673 F.2d at 15. *See also Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.1991) ("limitation merely creates a 'presumption of inapplicability' of skills and abilities acquired in work performed outside the fifteen year period"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir.1989) (use of the word "usually" in the regulation indicates that the Commissioner "sometimes *does* look to work done before the 15–year period"). The regulations make clear, however, that the process of determining the relevance of such prior work entails a number of subsidiary inquiries, *e.g.*, when the particular job was done, whether it lasted long enough for a claimant to know how to do it, whether the work skills acquired continue to apply, whether the work was only "off and on" or for brief periods of time. *See* 20 C.F.R. §§ 404.1565(a), 416.965(a) (2007). As the regulations state, the fifteen-year reference is simply "intended to insure that remote experience is not currently applied." *Id.*

The instant record, however, contains no searching inquiry as to any of these questions. This is in stark contrast to other similar situations. *See, e.g., Pickner v. Sullivan*, 985 F.2d 401, 403–04 (8th Cir. 1993) (work performed prior to the fifteen-year period may be considered relevant if there is a "continuity in job skills" between that work and claimant's more recent work); *Dudley v. Sec'y of Health & Human Servs.*, 816 F.2d 792, 794 (1st Cir. 1987) (three months work as a labeller sufficient to constitute past relevant work); *Bowman v. Heckler*, 706 F.2d 564, 567 (5th Cir.1983) (prior work as a domestic more than fifteen years prior applicable where evidence showed that claimant continued performing own housecleaning in interim).

Indeed, there was virtually nothing in the record upon which the ALJ could have based the required analysis. Plaintiff's testimony concerning his work as a gas attendant was, to say the least, sparse. When asked by the ALJ about other jobs he may have done, Plaintiff testified as follows:

A. Yeah, pumping gas, bakery truck, odd jobs that I've always done, you know, around our neighborhood like cutting the grass and painting and we had a cottage. Everybody knew me, you know—

Q. All—

A. —and trusted me and, you know, I'd open their camp for the season and—

Q. For how long—

A. —paint their boats and—

Q. For how long a period did you do these jobs such as pumping gas and I think you mentioned department stores and cutting laws. I mean, what do you we talking a year or five years or—

A. No, quite some time. I mean, I always kept busy, you one way or another. You know, about, I mean, most, a lot of it under the table but, you know, that's how I got paid. I mean, didn't really, didn't really matter.

Q. Well, let's just take pumping gas. Would—

A. Well—

Q. —did you do that for any length of time or was it

A. No.

Q. —a week here and a week there?

A. Well, it was always like a couple of months and, you

Q. All right. Well, let's take one time.

A. Well, then that—

Q. Couple of months.

A. Coup—, yeah, there.

Q. Were you the guy in the booth that handled the money or you, would you—

A. Do, no. I pumped the gas and handled—

Q. You were out by the pumps.

A. Both, you know.

Q. So if somebody—

A. I had to run in and out, you know.

Q. So if somebody came in said I want $10 worth of gas. You go open their tank and you put the hose in. You pump it. They give you a 20, you go inside and get change and bring it back to them.

A. Right.

Q. Okay. You did that a couple of different times for a couple of months at a time?

A. Yeah.

(A.R. 603–05.) As is obvious, this testimony hardly touched upon the inquiries called for by the regulation, let alone clarified *when* Plaintiff engaged in such work.[4]

Similarly, the record does not reveal, as was true in *Lopez–Diaz,* the "undisputed testimony of a vocational expert" concerning the skills needed for work as a gas station attendant. Granted, the Commissioner now offers an excerpt from the DOT in support of his argument that the job does not involve climbing as exposure to hazards, and only occasional stooping, kneeling and crawling. But, as noted, the DOT was not invoked by either the vocational expert or the ALJ. At most, as indicated, the vocational expert described the job as "unskilled, light." And, when asked whether an individual like Plaintiff could do any of his past work, the vocational expert answered as follows:

No, Your Honor, not in considering the age of this gentlemen placing him at the advanced age level and, therefore, only considering transferable skills and limitations of carrying out and following simple instructions would limit him to unskilled jobs. And although his past job as a gas station attendant would be

---

**4.** The court notes that the ALJ's initial decision of June 5, 2002, did not even cite the gas station attendant's job, despite the fact that it had been mentioned, albeit briefly, by Plaintiff during the course of his testimony at the first administrative hearing. The sum total of Plaintiff's testimony on point went as follows:

Q. Any other kinds of work that you've done in your career?

A. Yeah. I worked at department stores. I worked at bakeries. I worked—oh, gee—gas stations.

Q. In those jobs, were you on your feet most of the time you performed assignments—department stores, bakeries, gas stations?

A. Yeah.

Q. What were you doing—waiting on customers?

A. Yeah, and the bakery, I would be up early and I'd drive down to Connecticut and unload cakes and—

Q. So you did unloading?

A. Right.

Q. Did you do stocking when you worked at the department store?

A. Yes.

Q. Lifting merchandise and so forth?

A. Right.

Q. What kind of weights did you handle in these jobs?

A. Toys.

Q. What kinds of weights? How heavy were the objects?

A. Not very heavy—ten pounds at the most.

Q. Could you do the department store, bakery or gas station-type work today?

A. I don't think so.

Q. Why not?

A. The way I am today—well, I'm in pain all day and it's horrible. I'm a different person. I don't know what to say. I'm like a shell of a man.

(A.R. at 35–36.) The ALJ determined at the time that Plaintiff was unable to perform *any* of this past relevant work. (A.R. at 23.)

at the light level, I don't believe that I would consider that based on the grid rules for his age, there would be no transferability.[5]

(A.R. 633–34.) The vocational expert went on to testify that his answers would be no different if the individual were fifty-two to fifty-four years of age rather than fifty-five. (A.R. at 634.) Only when the ALJ told the vocational expert to "forget all about the grid rules" did he opine that Plaintiff could do his past work, and only such work, as a gas station attendant. (A.R. at 634–35.) [6]

In the end, there was insubstantial evidence for the ALJ's apparent assumption that Plaintiff's job as a gas station attendant fell within the fifteen-year limit or was anything other than "off and on." *See Lanes v. Harris,* 656 F.2d 285, 287 (8th Cir.1981) (five weeks as a water meter checker not past relevant work); *Ruperto Torres v. Sec'y of Health & Human Servs.,* 791 F.Supp. 342, 343 (D.P.R.1992) (work performed on an "off-and-on" basis not generally part of past relevant work calculation); *Love v. Heckler,* 564 F.Supp. 195, 198 (W.D.N.C.1983) (three months as a cone grader insufficient under 20 C.F.R. § 404.1565(a)). Indeed, Plaintiff did not even include the job in his work history report. (See A.R. at 150–56.) That omission, of course, is not binding on the Commissioner, but it obviously indicates that the job was either so remote in time or so sporadic as to be practically meaningless for analytical purposes.

## IV. CONCLUSION

The ALJ did not have substantial evidence to conclude that Plaintiff could do work as a gas station attendant, even if it were to be considered past relevant work. Accordingly, the Commissioner's motion to affirm will be denied and Plaintiff's motion, to the extent it seeks remand, will be allowed. On remand, the administrative law judge shall hold a new hearing so that step four, and possibly step five, of the analysis can be re-addressed in accord herewith.

IT IS SO ORDERED.

---

5. The "grid" is a matrix of factors for determining at step five of the analysis whether an individual disabled from doing his previous work is able to do other work. *Ortiz v. Sec'y of Health & Human Servs.,* 890 F.2d 520, 524 (1st Cir.1989).

6. Upon further questioning involving greater limitations, *i.e.,* the need for unscheduled breaks, the vocational expert opined that Plaintiff could not do any of his previous work even if the expert were to "forget about the grid rules," which the ALJ indicated he would "take care of ... later." (*Id.*)